# Exhibit A

to

Stipulation for Research In Motion to File Its First
Amended Reply and Counterclaim

1   Robert G. Krupka, P.C. (Bar No. 196625)
    E-mail: bkrupka@kirkland.com
2   Marc H. Cohen (Bar No. 168773)
    E-mail: mcohen@kirkland.com
3   Philip T. Chen (Bar No. 211777)
    E-mail: pchen@kirkland.com
4   KIRKLAND & ELLIS LLP
    777 South Figueroa Street
5   Los Angeles, California 90017
    Telephone:    (213) 680-8400
6   Facsimile:    (213) 680-8500

7   Attorneys for RESEARCH IN MOTION LIMITED
    and RESEARCH IN MOTION CORPORATION
8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12

13   RESEARCH IN MOTION LIMITED,          Case No. C-07-3177 (MMC)

14            Plaintiff,                   **RESEARCH IN MOTION'S FIRST
                                           AMENDED REPLY TO VISTO'S FIRST**
15        v.                               **AMENDED COUNTERCLAIM; AND
                                           COUNTER-COUNTERCLAIM**
16
     VISTO CORPORATION,
17
              Defendant.
18

19   AND RELATED COUNTERCLAIM

20

21

22

23

24

25

26

27

28

Plaintiff Research In Motion Limited ("RIM Ltd.") and Counterdefendant Research In Motion Corporation ("RIM Corp.") (collectively "RIM"), by their attorneys, reply to the First Amended Counterclaim of Defendant Visto Corporation ("Visto") against RIM:

## PARTIES

1.    Admitted.

2.    Admitted.

3.    Admitted that RIM Corp. is a corporation organized and existing under the laws of the State of Delaware and registered to do business in the State of Texas.  Admitted that RIM Corp. is doing business in the Eastern District of Texas and elsewhere in the United States.  Admitted that RIM Corp. is the United States distributor of RIM Ltd. products and services.  Denied in all other respects.

## JURISDICTION, VENUE & INTRADISTRICT ASSIGNMENT

4.    Admitted.

5.    Admitted.

6.    Admitted that RIM has sufficient contacts with the Northern District of California to subject it to the person jurisdiction of this Court for purposes of Visto's First Amended Counterclaim.  Admitted that RIM Ltd. has a pending civil action against Visto in this district.  Denied in all other respects.

7.    Admitted.

8.    Admitted.

## GENERAL ALLEGATIONS

9.    On information and belief, Visto was established in 1996 and currently offers personal and corporate wireless messaging solutions to mobile operators for personal and corporate use.  Denied in all other respects.

10.    RIM lacks information sufficient to admit or deny that Visto holds all right, title, and interest in and to United States Patent No. 7,225,231, and on that basis denies it.  Admitted that the '231 patent, entitled "System and Method for Transmitting Workspace Elements Across a Network," was issued by the USPTO on May 29, 2007 in the name of Daniel J. Mendez et al.  Denied that the

RIM's First Amended Reply and Counter-
Counterclaim  Case No. C-07-3177 (MMC)

'231 patent was duly and properly issued.  Admitted that a document purporting to be the '231 patent is attached as Exhibit 1 to the First Amended Answer and Counterclaim.  Denied in all other respects.

11.     RIM lacks information sufficient to admit or deny that Visto holds all right, title, and interest in and to United States Patent No. 7,228,383, and on that basis denies it.  Admitted that the '383 patent, entitled "System and Method for Progressive and Hierarchical Caching," was issued by the USPTO on June 5, 2007 in the name of Gregory S. Friedman et al.  Denied that the '383 patent was duly and properly issued.  Admitted that a document purporting to be the '383 patent is attached as Exhibit 2 to the First Amended Answer and Counterclaim.  Denied in all other respects.

12.     Admitted that RIM provides products under the Blackberry® mark.  Denied that doing so infringes the '231 patent or the '383 patent, either directly or indirectly, literally or under the doctrine of equivalents, willfully or otherwise.  Denied in all other requests.

13.     Denied.

14.     Denied.

<u>**COUNT I**</u>
**(Declaratory Judgment of Non-Infringement)**

15.     RIM incorporates the admissions and denials set forth in Paragraphs 1-14 as if fully set forth herein.

16.     Admitted.

17.     Denied.

<u>**COUNT II**</u>
**(Declaratory Judgment of Invalidity)**

18.     RIM incorporates the admissions and denials set forth in Paragraphs 1-17 as if fully set forth herein.

19.     Admitted.

20.     Denied.

**COUNT III**
**(U.S. Patent No. 7,225,231)**

21.     RIM incorporates the admissions and denials set forth in Paragraphs 1-20 as if fully set forth herein.

22.     Denied.

23.     Denied.

24.     Denied.

25.     Denied.

**COUNT IV**
**(U.S. Patent No. 7,228,383)**

26.     RIM incorporates the admissions and denials set forth in Paragraphs 1-25 as if fully set forth herein.

27.     Denied.

28.     Denied.

29.     Denied.

30.     Denied.

**PRAYER FOR RELIEF ON FIRST AMENDED COUNTERCLAIM**

The remainder of Visto's First Amended Counterclaim comprises Visto's prayer for relief to which no response is required.  To the extent that any response may be required, RIM (1) denies that Visto does not infringe the '839 patent; (2) denies that the claims of the '839 patent are invalid; (3) denies that RIM directly or indirectly infringes the '231 patent; (4) denies that RIM directly or indirectly infringes the '383 patent; and (5) denies that Visto is entitled to any damages.  Denied that Visto is entitled to attorneys' fees and costs.  Further, denied that Visto is entitled to any relief whatsoever against RIM.  Except as expressly admitted, RIM denies each and every allegation set forth in Visto's First Amended Counterclaim.

**AFFIRMATIVE AND OTHER DEFENSES**

31.     RIM asserts the following affirmative and other defenses, and reserves the right to amend its reply to assert any other basis for invalidity, unenforceability, or any other defense.

## FIRST DEFENSE
### (Failure to State a Claim)

32.    The First Amended Counterclaim fails to state a claim upon which relief can be granted against RIM.

## SECOND DEFENSE
### (Non-Infringement)

33.    RIM does not infringe and has not infringed, either directly or indirectly, contributorily, or by inducement, any claim of the '231 patent or the '383 patent, either literally or under the doctrine of equivalents, willfully or otherwise.

## THIRD DEFENSE
### (Invalidity)

34.    The '231 patent and the '383 patent are invalid for failure to comply with the requirements of 35 U.S.C. § 101, 102, 103 and/or 112.

## FOURTH DEFENSE
### (Laches)

35.    Visto's claims for relief are barred in whole or in part by the doctrine of laches.

## FIFTH DEFENSE
### (Estoppel)

36.    Visto's claims for relief are barred in whole or in part by the doctrine of estoppel.

## SIXTH DEFENSE
### (Prosecution History Estoppel)

37.    Visto is estopped from construing any claim of the '231 patent or '383 patent to cover or include, either literally or by application of the doctrine of equivalents, any system, process or method made, used, imported, sold, or offered for sale by RIM as a result of admissions and statements made during prosecution of the asserted patents.

## SEVENTH DEFENSE
### (Limitation of Damages)

38.    Visto's claims for damages against RIM are limited by the provisions of 35 U.S.C. § 287.

## EIGHTH DEFENSE
### (Waiver)

39.    Visto's claims for relief are barred in whole or in part by the doctrine of waiver.

## NINTH DEFENSE
### (Adequate Remedy at Law)

40.    Visto's claims for injunctive relief are barred in light of the fact that Visto has adequate remedies at law.

## TENTH DEFENSE
### (No Attorneys' Fees)

41.    Visto has alleged no facts, and RIM has not engaged in any conduct, that entitles Visto to an award of attorneys' fees.

## ELEVENTH DEFENSE
### (Unclean Hands)

42.    Visto's claims for relief are barred in whole or in part by the doctrine of unclean hands.

## TWELFTH DEFENSE
### (United States Government Immunity)

43.    Visto's claims for relief are barred in whole or in part by 28 U.S.C. § 1498 to the extent that RIM's accused actions are for the United States Government and with the authorization or consent of the United States Government.

## THIRTEENTH DEFENSE
### (Intervening Rights)

44.    Visto's claims for relief are barred in whole or in part by RIM's intervening rights pursuant to 35 U.S.C. §§ 252 and 307.

## FOURTEENTH DEFENSE
### (Inequitable Conduct)

45.    Visto's claims for relief are barred in whole or in part because the '231 patent and the '383 patent are unenforceable based on inequitable conduct.

### Inequitable Conduct -- Netscape Constellation

46.    On information and belief, in late November 1996, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with prosecution of the '231 and '383

patents, attended the Fall 1996 Comdex convention in Las Vegas, Nevada, where they observed a demonstration of the Netscape Constellation product and obtained pamphlets and other data distributed by Netscape relating to the Constellation product.

47.    On information and belief, after the Comdex convention named inventors Daniel Mendez, Mark Riggins, Prasad Wagle, Christine Ying, Gregory Friedman and Coyle Marl, and other Visto agents, attorneys, or inventors of the patents-in-suit, further discussed the Netscape Constellation product and described the product in numerous documents including competitive updates and presentations.

48.    On December 7, 1996, on information and belief, Visto agents, attorneys, or inventors of the patents-in-suit, exchanged a Netscape newsletter describing the Netscape Constellation product.

49.    On information and belief, at least named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl and/or other Visto agents and attorneys were aware of the Netscape Constellation product during the time that the applications resulting in the '231 and '383 patents were pending in the Patent and Trademark Office.

50.    During the time that the applications resulting in the '231 and '383 patents were pending in the Patent and Trademark Office, the Netscape Constellation product was never disclosed to the patent examiner.

51.    The Netscape Constellation product was material to the examination of the applications resulting in the '231 and '383 patents.

52.    The Netscape Constellation product was publicly disclosed at least as early as 1996.

53.    Constellation is a client/server solution for open email and groupware across Intranets. By transparently integrating Internet clients and servers with the desktop and existing productivity applications, Constellation provided powerful roaming access to users' relevant information. Constellation gathered the information that users care about and transparently replicated it to the server. Users could then access relevant files, content, bookmarks and email from a wide variety of computers that had network access. Similar to roaming on a cellular phone,

Constellation allowed users to access information from multiple locations as opposed to only from a single desktop location.

54.    On information and belief, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys involved in the prosecution of the applications resulting in the '231 and '383 patents failed to disclose the Netscape Constellation product with the intent to deceive or mislead the patent examiner.

**Inequitable Conduct -- Internet Message Access Protocol (IMAP)**

55.    On information and belief, at least as early as December 1996, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with prosecution of the '231 and '383 patents, including without limitation named inventors Mendez, Riggins, Wagle, Ying, Friedman, and Marl knew of and/or used the Internet Message Access Protocol ("IMAP"), an electronic mail industry standard.

56.    On information and belief, at least as early as December 1996, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with prosecution of the '231 and '383 patents, including without limitation named inventors Mendez, Riggins, Wagle, Ying, Friedman, and Marl or other Visto agents and attorneys knew of and/or worked on the development of Visto products that included IMAP technology, including a prototype called RoamPage that used IMAP software acquired from third-party NetAccent Inc. ("NetAccent").

57.    On information and belief, at least as early as December 1996, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys were aware of the email server and client technology conforming to version 4 of the IMAP standard ("IMAP 4").

58.    On information and belief, prior to at least December 1996, one or more named inventors of the '231 and '383 patents or other Visto agents and attorneys attended a trade conference related to the IMAP used as an electronic mail industry standard.

59.    On information and belief, as early as the end of the first quarter of 1997, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys identified IMAP as a technology they would like to use to implement a Visto product that is an embodiment of the invention claimed in the '231 and '383 patents.

60.     On information and belief, a group including named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys discussed NetAccent's IMAP 4 software on at least November 9, 1996.

61.     On information and belief, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys knew that Visto used NetAccent's IMAP 4 software, known as DART, in the RoamPage product.

62.     On information and belief, from at least after November 19, 1996 through at least before December 14, 1996, named inventors Mendez, Riggins, Wagle, Ying, Friedman, or Marl exchanged email discussing IMAP technology and NetAccent's IMAP 4 software.

63.     On information and belief, named inventor Wagle discussed NetAccent's IMAP 4 software in a presentation about the RoamPage product during or before the time of the prosecution of the '231 and '383 patents.

64.     On information and belief, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys knew that Visto used IMAP 4 technology in products subsequent to the RoamPage product, including at least the Visto Briefcase product.

65.     During the time of the prosecution of the '231 and '383 patents, information about the features and operation of the IMAP 4 technology, including its synchronization capabilities, were not disclosed to the Patent and Trademark Office.

66.     During the time of the prosecution of the '231 and '383 patents, information about the features and operation of IMAP 4 software that Visto used in products, including NetAccent's IMAP 4 software, and information relating to Visto's use of the IMAP 4 software in products were not disclosed to the Patent and Trademark Office.

67.     The IMAP 4 email standard is material to the applications resulting in the '231 and '383 patents.

68.     At least as early as 1994, a public Request For Comments by the Network Working Group of the Internet Engineering Task Force (RFC 1730) described IMAP 4 as a method and system for synchronizing e-mail using the Internet.

69.    On information and belief, the IMAP 4 allowed a client to access and manipulate electronic mail messages on a server.  IMAP4 permitted manipulation of remote message folders, called "mailboxes," in a way that was functionally equivalent to local mailboxes.  IMAP4 also provided the capability for an offline client to resynchronize with the server.

70.    The features and operation of IMAP 4 software that Visto used, including NetAccent's IMAP 4 software, are material to the applications resulting in the '231 and '383 patents and subsequent reexaminations.

71.    On information and belief, NetAccent's IMAP 4 software could be used with a smart phone at least as early as 1997.  At that time, NetAccent Inc. was shipping a Java-based email suite called DART Mail 1.0 which supported the IMAP 4 protocol to allow users to store email on the ISP's server.  As such, someone using more than one computer never had to worry about synchronizing e-mail directories between various machines.  NetAccent considered airport and trade show kiosks, hotel guests, and eventually public "smart" telephones as targets for DART Mail.  A person could use a computer at work, a different computer at home, to access email via a hotel's computers, and to check messages with a PDA, all without copying messages from one system to another.

72.    Visto's use of the IMAP 4 software in products is material to the applications resulting in the '231 and '383 patents.

73.    On information and belief, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys involved in the prosecution of the '231 and '383 patents intentionally failed to disclose the IMAP 4 e-mail technology with the intent to deceive or mislead the patent examiner.

74.    On information and belief, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys involved in the prosecution of the '231 and '383 patents intentionally failed to disclose features and operation of IMAP 4 software that Visto used, including NetAccent's IMAP 4 software, and information relating to Visto's use of the IMAP 4 software in products with the intent to deceive or mislead the patent examiner.

RIM's First Amended Reply and Counter-
Counterclaim  Case No. C-07-3177 (MMC)

**Inequitable Conduct -- Prosecution of the '231 Patent**

75.    On information and belief, one or more inventors of the '231 patent or Visto agents and attorneys associated with prosecution of the '231 patent, including without limitation named inventors Mendez, Riggins, Wagle, and Ying knew of art that was material to the patentability of the '231 patent, including art that demonstrated the "record entries" limitation, that was not disclosed to the patent examiner.

76.    On November 6, 2006, during the prosecution of the '231 patent, Visto argued to the Patent and Trademark Office that the pending claims were allowable over prior art because the prior art "is directed only to copying entire files as contrasted with record entries in a file."

77.    Following the November 6, 2006 Amendment, the patent examiner issued a Notice of Allowance on December 21, 2006 for the amended claims which included the "record entries" limitation.

78.    Visto has asserted U.S. Patent No. 6,708,221, which issued from the parent application to the application resulting in the '231 patent, against various parties.  Those parties have identified numerous prior art references to the '221 patent that are likewise material to the patentability of the '231 patent.

79.    For example, on March 24, 2006, Smartner served its preliminary invalidity contentions in *Visto Corp. v. Smartner Information Systems, Ltd.*, No. 2:05-CV-91-TJW (E.D. Tex.). Those invalidity contentions identified U.S. Patent No. 5,787,441 in addition to other references. The '441 patent was also identified, among other references, to Visto on July 28, 2006 in invalidity contentions by Microsoft in *Visto Corp. v. Microsoft Corp.*, No. 2:05-CV-546 (DJF) (E.D. Tex.).

80.    The '441 patent issued to Steven Beckhardt and is entitled "Method of Replicating Data at a Field Level."  The specification of the '441 patent discloses, among other things, replication of data at a field level as contrasted with replication of entire files or databases.

81.    On information and belief, with intent to deceive, the inventors and Visto agents and attorneys associated with the prosecution of the '231 patent withheld from the Patent and Trademark Office the existence of material references identified by opposing parties in litigation involving the parent patent, including the '441 patent.

82.     On information and belief, the withheld references were material to the patentability of the '231 patent, at least because the '441 patent refutes, and is inconsistent with, positions that the inventors and Visto agents and attorneys took in opposing arguments of unpatentability by the patent examiner, makes a prima facie case of unpatentability, and the patent examiner would have found this information important.  These references were withheld from the Patent and Trademark Office with knowledge of their materiality and with intent to deceive, and in violation of at least 35 C.F.R. § 1.56 and the Manual of Patent Examining Procedure ("MPEP") §§  2001.06(a) and 2001.06(c).

**Inequitable Conduct -- Traveling Software Prior Art**

83.     On information and belief, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with prosecution of the '231 and '383 patents knew of the following prior art references published, produced, and/or assigned to Traveling Software, Inc. (collectively "Traveling Software Prior Art"):

        a.     SpeedSync software program and literature;

        b.     LapLink software program and literature related to LapLink; and

        c.     U.S. Patent Nos. 5,446,888 and 5,721,907.

84.     On information and belief, the Traveling Software Prior Art was known by one or more one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with the prosecution of the '231 and '383 patents including without limitation named inventors Mendez, Wagle, and Riggins during the prosecution of the '231 patent.

85.     On information and belief, Traveling Software Inc.'s LapLink software uses and/or incorporates SpeedSync software.

86.     U.S. Patent Nos. 5,446,888 and 5,721,907 are, on information and belief, assigned to Traveling Software, Inc. and are related to LapLink and Speedsync software.  On information and belief, LapLink and Speedsync software are embodiments of the inventions described and claimed by U.S. Pat. Nos. 5,446,888 and 5,721,907.

87.     On information and belief, Traveling Software Inc. marks LapLink and Speedsync software and manuals, informing users of related U.S. Patents.

88.    On information and belief, named inventors Riggins and Mendez stated under oath that they knew of and/or used Laplink software before or during the prosecution of the '231 and '383 patents.

89.    On information and belief, at least as early as July 20, 1998 named inventors Mendez, and Wagle discussed the acquisition of SpeedSync software for Visto.

90.    Information about the features and operation of the Traveling Software Prior Art were not disclosed to the Patent and Trademark Office during prosecution of the '231 and '383 patents.

91.    The Traveling Software Prior Art was material to the examination of the applications resulting in the '231 and '383 patents.

92.    A LapLink software manual published by Traveling Software, Inc. at least as early as 1996 describes that LapLink software synchronizes data.

93.    On information and belief, LapLink for Windows 95 supported TCP/IP networks, and could connect any two computers that dialed in to the Internet.  A user could utilize LapLink to remote control or exchange files anywhere in the world.

94.    On information and belief, at least as early as 1996, Traveling Software Inc.'s SpeedSync software synchronized data. SpeedSync was designed to cut transfer times when users were updating files.  It had no effect when a user copied files that were not on the target before copying started.  Before a file was copied, SpeedSync searched the target for a file with the same name.  If none was found, the entire file was copied.  Otherwise, the two files were compared to locate changes in the source file.  Only the changes located in the source file were copied.

95.    The specifications of U.S. Patent Nos. 5,446,888 and 5,721,907 disclose a file transfer method that identifies and isolates the differences between two files, and transmits only those differences to the receiving computer.

96.    On information and belief, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with the prosecution of the '231 and '383 patents and intentionally failed to disclose the Traveling Software Prior Art with the intent to deceive or mislead the patent examiner.

RIM's First Amended Reply and Counter-
Counterclaim  Case No. C-07-3177 (MMC)

**Inequitable Conduct -- Intellisync/PumaTech**

97.     On information and belief, at least as early as January 1997, one or more inventors of the '231 and '383 patents, including without limitation Daniel Mendez, or Visto agents and attorneys associated with prosecution of the '231 and '383 patents, met with representatives of PumaTech to discuss the use and integration of PumaTech's synchronization technology in Visto products.

98.     On information and belief, one or more inventors of the '231 and '383 patents, including without limitation Daniel Mendez, or Visto agents and attorneys associated with the prosecution of the '231 and '383 patents, learned as early as May 14, 1997 that third-party Unwired Planet, Inc. intended to use PumaTech technology to synchronize data using the Internet.

99.     On information and belief, PumaTech's synchronization technology as of at least January 1997, including the Intellisync Translator product, was used in Visto products during or before the times that the applications resulting in the '231 and '383 patents were pending in the Patent and Trademark Office.

100.     During the time that the applications resulting in the '231 and '383 patents and subsequent reexaminations were pending in the Patent and Trademark Office, PumaTech's synchronization technology as of at least January 1997, including the Intellisync Translator product, was never disclosed to the patent examiner.

101.     During the time that the applications resulting in the '231 and '383 patents and subsequent reexaminations were pending in the Patent and Trademark Office, Visto's use of PumaTech's synchronization technology as of at least January 1997 in products was never disclosed to the patent examiner.

102.     PumaTech's synchronization technology as of January 1997 was material to the examination of the applications resulting in the '231 and '383 patents.

103.     On information and belief, the Intellisync Translator API specification defined a C++ member function interface which allowed an Intellisync translator to read and update PIM/PDA application data.  When stand-alone import and export translation was performed, all relevant application data needed to be processed.  Like import and export, slow synchronization implied that all relevant application data must be processed for each and every synchronization run, even when

13                  RIM's First Amended Reply and Counter-
                    Counterclaim  Case No. C-07-3177 (MMC)

the majority of records had not changed since the last synchronization run.  When performing

synchronization, Intellisync maintained history files which retained copies of previously

synchronized application data records.  By using unique record IDs to access these previously

synchronized records in these history files, it was unnecessary to re-read application records that had

not changed since the last synchronization run.  This was called Fast synchronization.  Fast

synchronization could drastically reduce the time required to synchronize application data which had

been previously synchronized.

104.     Information that Visto used PumaTech's synchronization technology in products is

material to the applications resulting in the '231 and '383 patents.

105.     On information and belief, one or more inventors of the '231 and '383 patents or

Visto agents and attorneys associated with the prosecution of the '231 and '383 patents intentionally

failed to disclose PumaTech's synchronization technology as of January 1997, including Intellisync

Translator, and Visto's use of PumaTech's synchronization technology in products with the intent to

deceive or mislead the patent examiner.

**Inequitable Conduct -- pcAnywhere, Reachout and Carbon Copy**

106.     On information and belief, one or more inventors of the '231 and '383 patents or

Visto agents and attorneys associated with prosecution of the '231 and '383 patents knew of the

following prior art references (collectively "Omitted Prior Art"):

        a.     the pcANYWHERE32 software program and literature;

        b.     the Reachout software program and literature; and

        c.     the Carbon Copy software program and literature.

107.     On information and belief, one or more inventors of the '231 and '383 patents or

Visto agents and attorneys associated with prosecution of the '231 and '383 patents knew of the

pcANYWHERE32 software program and literature at least as early as June 28, 1996.

108.     On information and belief, one or more inventors of the '231 and '383 patents or

Visto agents and attorneys associated with the prosecution of the '231 and '383 patents knew of the

Reachout software program and literature at least as early as June 28 1996.

109.    During the time that the applications resulting in the '231 and '383 patents were pending in the Patent and Trademark Office, the Omitted Prior Art was never disclosed to the patent examiner.

110.    The Omitted Prior Art was material to the examination of the applications resulting in the '231 and '383 patents because, on information and belief, these references describe exchanging data between a computer and a remote device.

111.    On information and belief, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with the prosecution of the '231 and '383 patents intentionally failed to disclose the Omitted Prior Art with the intent to deceive or mislead the patent examiner.

112.    RIM reserves the rights to assert any other basis for unenforceability, or any other defense, that discovery may reveal.


## RIM'S COUNTER-COUNTERCLAIM

Research In Motion Limited ("RIM Ltd.") and Research In Motion Corporation ("RIM Corp.") (collectively "RIM"), by their attorneys, allege as follows for their Counter-Counterclaim against Visto Corporation ("Visto"):

### PARTIES

1.    RIM Ltd. is a Canadian corporation with its principal place of business at 295 Phillip Street, Waterloo, Ontario, Canada  N2L 3W8.

2.    RIM Corp. is a Delaware corporation with its principal place of business at 5000 Riverside Dr., Building 6, Brazos East, Suite 100, Irving, Texas  75039.

3.    Defendant Visto is a Delaware corporation with its principal place of business at 101 Redwood Shores Parkway, Redwood City, California  94065.

### JURISDICTION

4.    The Court has subject matter jurisdiction over this Counter-Counterclaim pursuant to 28 U.S.C. §§ 1331, 1338(a), and 2201.

**VENUE**

5.    Venue properly lies in this District under 28 U.S.C. §§ 1391 and 1400(b) because the asserted claims arose in this district, and Visto has an established place of business within this District at 101 Redwood Shores Parkway in Redwood City, California.

**INTRADISTRICT ASSIGNMENT**

6.    This action for patent infringement shall be assigned on a district-wide basis according to Civil L. R. 3-2(c).

**FACTUAL BACKGROUND**

7.    RIM is a leading designer, manufacturer and marketer of innovative wireless solutions for the worldwide mobile communications market.

8.    RIM's portfolio of award-winning products are used by thousands of organizations around the world and includes the BlackBerry® wireless platform, software development tools, and software/hardware intellectual property that is licensed.

9.    Visto is a provider of personal and corporate wireless messaging solutions to mobile operators for personal and corporate use.

**COUNT I**
**(Declaratory Judgment of Non-Infringement of the '231 Patent)**

10.    RIM re-alleges and incorporates by reference the foregoing paragraphs 1-9 as though fully set forth herein.

11.    An actual controversy has arisen and now exists between the parties regarding non-infringement of United States Patent No. 7,225,231 ("the '231 patent") because Visto has asserted in its First Amended Counterclaim that RIM infringes this patent.

12.    RIM has not infringed, and does not infringe, directly, contributorily, or by inducement, any valid, enforceable and properly-construed claim of the '231 patent, either literally or under the doctrine of equivalents.

13.    RIM is entitled to a declaratory judgment that it has not infringed, and is not infringing, any valid or enforceable claim of the '231 patent.

## COUNT II
### (Declaratory Judgment of Invalidity of the '231 Patent)

14.    RIM re-alleges and incorporates by reference the foregoing paragraphs 1-13 as though fully set forth herein.

15.    An actual controversy has arisen and now exists between the parties regarding invalidity of the '231 patent because Visto has asserted in its First Amended Counterclaim that RIM infringes this patent, and that the patent was duly and legally issued.

16.    The asserted claims of the '231 patent, as properly construed, are invalid for failure to comply with the requirements of the patent laws of the United States as set forth in Title 35 of the United States Code, including without limitation 35 U.S.C. §§ 101, 102, 103, and/or 112.

17.    RIM is entitled to a declaratory judgment that the asserted claims of the '231 patent are invalid.

## COUNT III
### (Declaratory Judgment of Non-Infringement of the '383 Patent)

18.    RIM re-alleges and incorporates by reference the foregoing paragraphs 1-17 as though fully set forth herein.

19.    An actual controversy has arisen and now exists between the parties regarding non-infringement of United States Patent No. 7,228,383 ("the '383 patent") because Visto has asserted in its First Amended Counterclaim that RIM infringes this patent.

20.    RIM has not infringed, and does not infringe, directly, contributorily, or by inducement, any valid, enforceable and properly-construed claim of the '383 patent, either literally or under the doctrine of equivalents.

21.    RIM is entitled to a declaratory judgment that it has not infringed, and is not infringing, any valid or enforceable claim of the '383 patent.

## COUNT IV
### (Declaratory Judgment of Invalidity of the '383 Patent)

22.    RIM re-alleges and incorporates by reference the foregoing paragraphs 1-21 as though fully set forth herein.

23.     An actual controversy has arisen and now exists between the parties regarding invalidity of the '383 patent because Visto has asserted in its First Amended Counterclaim that RIM infringes this patent, and that the patent was duly and legally issued.

24.     The asserted claims of the '383 patent, as properly construed, are invalid for failure to comply with the requirements of the patent laws of the United States as set forth in Title 35 of the United States Code, including without limitation 35 U.S.C. §§ 101, 102, 103, and/or 112.

25.     RIM is entitled to a declaratory judgment that the asserted claims of the '383 patent are invalid.

## COUNT V
### (Declaratory Judgment of Unenforceability of the '231 and '383 Patents)

26.     RIM re-alleges and incorporates by reference the foregoing paragraphs 1-25 as though fully set forth herein.

### Inequitable Conduct -- Netscape Constellation

27.     On information and belief, in late November 1996, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with prosecution of the '231 and '383 patents, attended the Fall 1996 Comdex convention in Las Vegas, Nevada, where they observed a demonstration of the Netscape Constellation product and obtained pamphlets and other data distributed by Netscape relating to the Constellation product.

28.     On information and belief, after the Comdex convention named inventors Daniel Mendez, Mark Riggins, Prasad Wagle, Christine Ying, Gregory Friedman and Coyle Marl, and other Visto agents, attorneys, or inventors of the patents-in-suit, further discussed the Netscape Constellation product and described the product in numerous documents including competitive updates and presentations.

29.     On December 7, 1996, on information and belief, Visto agents, attorneys, or inventors of the patents-in-suit, exchanged a Netscape newsletter describing the Netscape Constellation product.

30.     On information and belief, at least named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl and/or other Visto agents and attorneys were aware of the Netscape Constellation

product during the time that the applications resulting in the '231 and '383 patents were pending in the Patent and Trademark Office.

31.    During the time that the applications resulting in the '231 and '383 patents were pending in the Patent and Trademark Office, the Netscape Constellation product was never disclosed to the patent examiner.

32.    The Netscape Constellation product was material to the examination of the applications resulting in the '231 and '383 patents.

33.    The Netscape Constellation product was publicly disclosed at least as early as 1996.

34.    Constellation is a client/server solution for open email and groupware across Intranets.  By transparently integrating Internet clients and servers with the desktop and existing productivity applications, Constellation provided powerful roaming access to users' relevant information.  Constellation gathered the information that users care about and transparently replicated it to the server.  Users could then access relevant files, content, bookmarks and email from a wide variety of computers that had network access.  Similar to roaming on a cellular phone, Constellation allowed users to access information from multiple locations as opposed to only from a single desktop location.

35.    On information and belief, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys involved in the prosecution of the applications resulting in the '231 and '383 patents failed to disclose the Netscape Constellation product with the intent to deceive or mislead the patent examiner.

**Inequitable Conduct -- Internet Message Access Protocol (IMAP)**

36.    On information and belief, at least as early as December 1996, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with prosecution of the '231 and '383 patents, including without limitation named inventors Mendez, Riggins, Wagle, Ying, Friedman, and Marl knew of and/or used the Internet Message Access Protocol ("IMAP"), an electronic mail industry standard.

37.    On information and belief, at least as early as December 1996, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with prosecution of the '231

and '383 patents, including without limitation named inventors Mendez, Riggins, Wagle, Ying, Friedman, and Marl or other Visto agents and attorneys knew of and/or worked on the development of Visto products that included IMAP technology, including a prototype called RoamPage that used IMAP software acquired from third-party NetAccent Inc. ("NetAccent").

38.    On information and belief, at least as early as December 1996, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys were aware of the email server and client technology conforming to version 4 of the IMAP standard ("IMAP 4").

39.    On information and belief, prior to at least December 1996, one or more named inventors of the '231 and '383 patents or other Visto agents and attorneys attended a trade conference related to the IMAP used as an electronic mail industry standard.

40.    On information and belief, as early as the end of the first quarter of 1997, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys identified IMAP as a technology they would like to use to implement a Visto product that is an embodiment of the invention claimed in the '231 and '383 patents.

41.    On information and belief, a group including named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys discussed NetAccent's IMAP 4 software on at least November 9, 1996.

42.    On information and belief, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys knew that Visto used NetAccent's IMAP 4 software, known as DART, in the RoamPage product.

43.    On information and belief, from at least after November 19, 1996 through at least before December 14, 1996, named inventors Mendez, Riggins, Wagle, Ying, Friedman, or Marl exchanged email discussing IMAP technology and NetAccent's IMAP 4 software.

44.    On information and belief, named inventor Wagle discussed NetAccent's IMAP 4 software in a presentation about the RoamPage product during or before the time of the prosecution of the '231 and '383 patents.

RIM's First Amended Reply and Counter-
Counterclaim  Case No. C-07-3177 (MMC)

45.    On information and belief, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys knew that Visto used IMAP 4 technology in products subsequent to the RoamPage product, including at least the Visto Briefcase product.

46.    During the time of the prosecution of the '231 and '383 patents, information about the features and operation of the IMAP 4 technology, including its synchronization capabilities, were not disclosed to the Patent and Trademark Office.

47.    During the time of the prosecution of the '231 and '383 patents, information about the features and operation of IMAP 4 software that Visto used in products, including NetAccent's IMAP 4 software, and information relating to Visto's use of the IMAP 4 software in products were not disclosed to the Patent and Trademark Office.

48.    The IMAP 4 email standard is material to the applications resulting in the '231 and '383 patents.

49.    At least as early as 1994, a public Request For Comments by the Network Working Group of the Internet Engineering Task Force (RFC 1730) described IMAP 4 as a method and system for synchronizing e-mail using the Internet.

50.    On information and belief, the IMAP 4 allowed a client to access and manipulate electronic mail messages on a server.  IMAP4 permitted manipulation of remote message folders, called "mailboxes," in a way that was functionally equivalent to local mailboxes.  IMAP4 also provided the capability for an offline client to resynchronize with the server.

51.    The features and operation of IMAP 4 software that Visto used, including NetAccent's IMAP 4 software, are material to the applications resulting in the '231 and '383 patents and subsequent reexaminations.

52.    On information and belief, NetAccent's IMAP 4 software could be used with a smart phone at least as early as 1997.  At that time, NetAccent Inc. was shipping a Java-based email suite called DART Mail 1.0 which supported the IMAP 4 protocol to allow users to store email on the ISP's server.  As such, someone using more than one computer never had to worry about synchronizing e-mail directories between various machines.  NetAccent considered airport and trade show kiosks, hotel guests, and eventually public "smart" telephones as targets for DART Mail.  A

person could use a computer at work, a different computer at home, to access email via a hotel's computers, and to check messages with a PDA, all without copying messages from one system to another.

53.     Visto's use of the IMAP 4 software in products is material to the applications resulting in the '231 and '383 patents.

54.     On information and belief, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys involved in the prosecution of the '231 and '383 patents intentionally failed to disclose the IMAP 4 e-mail technology with the intent to deceive or mislead the patent examiner.

55.     On information and belief, named inventors Mendez, Riggins, Wagle, Ying, Friedman, Marl or other Visto agents and attorneys involved in the prosecution of the '231 and '383 patents intentionally failed to disclose features and operation of IMAP 4 software that Visto used, including NetAccent's IMAP 4 software, and information relating to Visto's use of the IMAP 4 software in products with the intent to deceive or mislead the patent examiner.

**Inequitable Conduct -- Prosecution of the '231 Patent**

56.     On information and belief, one or more inventors of the '231 patent or Visto agents and attorneys associated with prosecution of the '231 patent, including without limitation named inventors Mendez, Riggins, Wagle, and Ying knew of art that was material to the patentability of the '231 patent, including art that demonstrated the "record entries" limitation, that was not disclosed to the patent examiner.

57.     On November 6, 2006, during the prosecution of the '231 patent, Visto argued to the Patent and Trademark Office that the pending claims were allowable over prior art because the prior art "is directed only to copying entire files as contrasted with record entries in a file."

58.     Following the November 6, 2006 Amendment, the patent examiner issued a Notice of Allowance on December 21, 2006 for the amended claims which included the "record entries" limitation.

59.     Visto has asserted U.S. Patent No. 6,708,221, which issued from the parent application to the application resulting in the '231 patent, against various parties. Those parties have

RIM's First Amended Reply and Counter-
Counterclaim  Case No. C-07-3177 (MMC)

identified numerous prior art references to the '221 patent that are likewise material to the patentability of the '231 patent.

60.    For example, on March 24, 2006, Smartner served its preliminary invalidity contentions in *Visto Corp. v. Smartner Information Systems, Ltd.*, No. 2:05-CV-91-TJW (E.D. Tex.). Those invalidity contentions identified U.S. Patent No. 5,787,441 in addition to other references. The '441 patent was also identified, among other references, to Visto on July 28, 2006 in invalidity contentions by Microsoft in *Visto Corp. v. Microsoft Corp.*, No. 2:05-CV-546 (DJF) (E.D. Tex.).

61.    The '441 patent issued to Steven Beckhardt and is entitled "Method of Replicating Data at a Field Level." The specification of the '441 patent discloses, among other things, replication of data at a field level as contrasted with replication of entire files or databases.

62.    On information and belief, with intent to deceive, the inventors and Visto agents and attorneys associated with the prosecution of the '231 patent withheld from the Patent and Trademark Office the existence of material references identified by opposing parties in litigation involving the parent patent, including the '441 patent.

63.    On information and belief, the withheld references were material to the patentability of the '231 patent, at least because the '441 patent refutes, and is inconsistent with, positions that the inventors and Visto agents and attorneys took in opposing arguments of unpatentability by the patent examiner, makes a prima facie case of unpatentability, and the patent examiner would have found this information important. These references were withheld from the Patent and Trademark Office with knowledge of their materiality and with intent to deceive, and in violation of at least 35 C.F.R. § 1.56 and the Manual of Patent Examining Procedure ("MPEP") §§ 2001.06(a) and 2001.06(c).

**Inequitable Conduct -- Traveling Software Prior Art**

64.    On information and belief, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with prosecution of the '231 and '383 patents knew of the following prior art references published, produced, and/or assigned to Traveling Software, Inc. (collectively "Traveling Software Prior Art"):

        a.    SpeedSync software program and literature;

        b.    LapLink software program and literature related to LapLink; and

c.    U.S. Patent Nos. 5,446,888 and 5,721,907.

65.    On information and belief, the Traveling Software Prior Art was known by one or more one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with the prosecution of the '231 and '383 patents including without limitation named inventors Mendez, Wagle, and Riggins during the prosecution of the '231 patent.

66.    On information and belief, Traveling Software Inc.'s LapLink software uses and/or incorporates SpeedSync software.

67.    U.S. Patent Nos. 5,446,888 and 5,721,907 are, on information and belief, assigned to Traveling Software, Inc. and are related to LapLink and Speedsync software.  On information and belief, LapLink and Speedsync software are embodiments of the inventions described and claimed by U.S. Pat. Nos. 5,446,888 and 5,721,907.

68.    On information and belief, Traveling Software Inc. marks LapLink and Speedsync software and manuals, informing users of related U.S. Patents.

69.    On information and belief, named inventors Riggins and Mendez stated under oath that they knew of and/or used Laplink software before or during the prosecution of the '231 and '383 patents.

70.    On information and belief, at least as early as July 20, 1998 named inventors Mendez, and Wagle discussed the acquisition of SpeedSync software for Visto.

71.    Information about the features and operation of the Traveling Software Prior Art were not disclosed to the Patent and Trademark Office during prosecution of the '231 and '383 patents.

72.    The Traveling Software Prior Art was material to the examination of the applications resulting in the '231 and '383 patents.

73.    A LapLink software manual published by Traveling Software, Inc. at least as early as 1996 describes that LapLink software synchronizes data.

74.    On information and belief, LapLink for Windows 95 supported TCP/IP networks, and could connect any two computers that dialed in to the Internet.  A user could utilize LapLink to remote control or exchange files anywhere in the world.

75.    On information and belief, at least as early as 1996, Traveling Software Inc.'s SpeedSync software synchronized data. SpeedSync was designed to cut transfer times when users were updating files.  It had no effect when a user copied files that were not on the target before copying started.  Before a file was copied, SpeedSync searched the target for a file with the same name.  If none was found, the entire file was copied.  Otherwise, the two files were compared to locate changes in the source file.  Only the changes located in the source file were copied.

76.    The specifications of U.S. Patent Nos. 5,446,888 and 5,721,907 disclose a file transfer method that identifies and isolates the differences between two files, and transmits only those differences to the receiving computer.

77.    On information and belief, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with the prosecution of the '231 and '383 patents and intentionally failed to disclose the Traveling Software Prior Art with the intent to deceive or mislead the patent examiner.

**Inequitable Conduct -- Intellisync/PumaTech**

78.    On information and belief, at least as early as January 1997, one or more inventors of the '231 and '383 patents, including without limitation Daniel Mendez, or Visto agents and attorneys associated with prosecution of the '231 and '383 patents, met with representatives of PumaTech to discuss the use and integration of PumaTech's synchronization technology in Visto products.

79.    On information and belief, one or more inventors of the '231 and '383 patents, including without limitation Daniel Mendez, or Visto agents and attorneys associated with the prosecution of the '231 and '383 patents, learned as early as May 14, 1997 that third-party Unwired Planet, Inc. intended to use PumaTech technology to synchronize data using the Internet.

80.    On information and belief, PumaTech's synchronization technology as of at least January 1997, including the Intellisync Translator product, was used in Visto products during or before the times that the applications resulting in the '231 and '383 patents were pending in the Patent and Trademark Office.

81.    During the time that the applications resulting in the '231 and '383 patents and subsequent reexaminations were pending in the Patent and Trademark Office, PumaTech's

synchronization technology as of at least January 1997, including the Intellisync Translator product, was never disclosed to the patent examiner.

82.     During the time that the applications resulting in the '231 and '383 patents and subsequent reexaminations were pending in the Patent and Trademark Office, Visto's use of PumaTech's synchronization technology as of at least January 1997 in products was never disclosed to the patent examiner.

83.     PumaTech's synchronization technology as of January 1997 was material to the examination of the applications resulting in the '231 and '383 patents.

84.     On information and belief, the Intellisync Translator API specification defined a C++ member function interface which allowed an Intellisync translator to read and update PIM/PDA application data.  When stand-alone import and export translation was performed, all relevant application data needed to be processed.  Like import and export, slow synchronization implied that all relevant application data must be processed for each and every synchronization run, even when the majority of records had not changed since the last synchronization run.  When performing synchronization, Intellisync maintained history files which retained copies of previously synchronized application data records.  By using unique record IDs to access these previously synchronized records in these history files, it was unnecessary to re-read application records that had not changed since the last synchronization run.  This was called Fast synchronization.  Fast synchronization could drastically reduce the time required to synchronize application data which had been previously synchronized.

85.     Information that Visto used PumaTech's synchronization technology in products is material to the applications resulting in the '231 and '383 patents.

86.     On information and belief, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with the prosecution of the '231 and '383 patents intentionally failed to disclose PumaTech's synchronization technology as of January 1997, including Intellisync Translator, and Visto's use of PumaTech's synchronization technology in products with the intent to deceive or mislead the patent examiner.

**Inequitable Conduct -- pcAnywhere, Reachout and Carbon Copy**

87.     On information and belief, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with prosecution of the '231 and '383 patents knew of the following prior art references (collectively "Omitted Prior Art"):

        a.     the pcANYWHERE32 software program and literature;

        b.     the Reachout software program and literature; and

        c.     the Carbon Copy software program and literature.

88.     On information and belief, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with prosecution of the '231 and '383 patents knew of the pcANYWHERE32 software program and literature at least as early as June 28, 1996.

89.     On information and belief, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with the prosecution of the '231 and '383 patents knew of the Reachout software program and literature at least as early as June 28 1996.

90.     During the time that the applications resulting in the '231 and '383 patents were pending in the Patent and Trademark Office, the Omitted Prior Art was never disclosed to the patent examiner.

91.     The Omitted Prior Art was material to the examination of the applications resulting in the '231 and '383 patents because, on information and belief, these references describe exchanging data between a computer and a remote device.

92.     On information and belief, one or more inventors of the '231 and '383 patents or Visto agents and attorneys associated with the prosecution of the '231 and '383 patents intentionally failed to disclose the Omitted Prior Art with the intent to deceive or mislead the patent examiner.

93.     RIM reserves the rights to assert any other basis for unenforceability, or any other allegation, that discovery may reveal.

**PRAYER FOR RELIEF**

WHEREFORE, RIM prays for entry of judgment as follows:

A.     Under the First Claim for Relief, that the Court determine and declare that RIM has not infringed, and is not infringing, any valid and enforceable claim of the '231 patent, either

RIM's First Amended Reply and Counter-
Counterclaim  Case No. C-07-3177 (MMC)

directly or indirectly, and either literally or under the doctrine of equivalents, and further that RIM has not actively induced or contributed to infringement of the '231 patent;

B.    Under the Second Claim for Relief, that the Court determine and declare that the asserted claims of the '231 patent are invalid and void;

C.    Under the Third Claim for Relief, that the Court determine and declare that RIM has not infringed, and is not infringing, any valid and enforceable claim of the '383 patent, either directly or indirectly, and either literally or under the doctrine of equivalents, and further that RIM has not actively induced or contributed to infringement of the '383 patent;

D.    Under the Fourth Claim for Relief, that the Court determine and declare that the asserted claims of the '383 patent are invalid and void;

E.    Under the Fifth Claim for Relief, that the Court determine and declare that the '231 and '383 patents are unenforceable on the basis of inequitable conduct;

F.    That the Court award RIM its attorney's fees and costs of suit pursuant to 35 U.S.C. § 285 and/or other applicable laws; and

G.    That RIM receives such other and further relief as the Court deems just and proper.

## JURY DEMAND

RIM hereby demands a trial by jury on all issues and claims so triable.

DATED:  January 29, 2008                KIRKLAND & ELLIS LLP


By: _____/s/_____.
Robert G. Krupka, P.C.
Marc H. Cohen
Philip T. Chen

Attorneys for
RESEARCH IN MOTION LIMITED and
RESEARCH IN MOTION CORPORATION